Filed 12/16/13

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>      **Plaintiff and Respondent,**<br><br>**v.**<br><br>**MARCELLOUS LEWIS,**<br><br>      **Defendant and Appellant.** | **A134480**<br><br>**(Alameda County<br>Super. Ct. No. 163699)** |

Marcellous Lewis (Lewis), a juvenile at the time of his offenses but tried as an adult, appeals from a judgment of conviction and sentence after a jury found him guilty of the sexual penetration and rape of one victim, the rape of a second victim, and the murder of a third victim. Lewis contends: (1) the court should have granted his motion to sever the rape and other sexual assault charges from the murder charge; (2) the court did not adequately investigate possible juror bias; (3) the prosecutor committed misconduct in his discussion of provocation during closing argument; (4) the sexual penetration and rape of one of the victims were not separate acts, and the court therefore should not have imposed consecutive terms for the corresponding offenses; and (5) his sentence of 115-years-to-life violates his constitutional right against cruel and unusual punishment.

In the published portion of this opinion, we conclude that Lewis' sentence is unconstitutional and the matter must be remanded for the trial court to determine a parole eligibility date within Lewis' expected lifetime, unless it concludes that his offenses

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II, sections A through D.

1

reflected such irreparable corruption that it is appropriate to preclude him from the possibility of parole during his lifetime.  In all other respects, we will affirm the judgment, as we conclude in the nonpublished portion of the opinion that Lewis' remaining arguments are unavailing.

I. <u>FACTS AND PROCEDURAL HISTORY</u>

In November 2009, the court granted the prosecution's motion to consolidate two complaints against Lewis:  a complaint charging him with the kidnap, sexual penetration, and rape of Jane Doe 1 and the kidnap and rape of Jane Doe 2; and a complaint charging him with the murder of Robert Tibbs (Tibbs).

In May 2010, the court held Lewis, a minor at the time of the crimes, to answer to the charges as an adult.  (Welf. & Inst. Code, § 707, subd. (d).)

In September 2011, Lewis was charged in an amended information with the following:  in count one, the murder of Tibbs (Pen. Code, § 187, subd. (a)[1]); in count two, sexual penetration with a foreign object upon Jane Doe 1 (§ 289, subd. (a)(1)); in count three, rape of Jane Doe 1 (§ 261, subd. (a)(2)); and in count four, rape of Jane Doe 2 (§ 261, subd. (a)(2)).  In connection with the murder count, the information alleged that Lewis had personally and intentionally discharged a firearm and caused great bodily injury and death.  (§§ 12022.53, subds. (b)-(d) & (g); 12022.7, subd. (a).)  As to the sexual assault counts, the information alleged that Lewis kidnapped his victims, and perpetrated offenses against multiple victims, within the meaning of the one strike law (§ 667.61).

By motion in limine, Lewis sought an order severing the sexual assault counts from the murder count.  As discussed *post*, the court denied the motion.

The matter proceeded to a jury trial.

A.  Prosecution Case

At trial, victim Jane Doe 1 was referred to as Crystal Doe (Crystal), and victim Jane Doe 2 was referred to as Sabrina Doe (Sabrina).  According to the prosecution,

---

[1]     Except where otherwise indicated, all statutory references are to the Penal Code.

2

Lewis digitally penetrated and raped Crystal, raped Sabrina, and shot and killed Tibbs, all before he turned 18 years old.

1. 2006 Digital Penetration and Rape of Crystal

Crystal met Lewis in 2005 or 2006. As of October 2006, she was 16 years old and he was 15 years old. Crystal was a virgin.

Crystal testified that she received a call from Lewis in the afternoon of October 2, 2006, as she was walking with her friend Malysa. When Lewis asked Crystal to go to his house, Crystal declined but agreed to meet him at a church at "East 21st and 21st Ave." Malysa went home.

Crystal met Lewis at the front steps of the closed church. When Crystal saw her brother drive by, Crystal and Lewis moved to the side steps of the church at Crystal's suggestion, because she thought she would be in trouble if her parents learned that she was with a boy.

After Lewis and Crystal talked for awhile at the side of the church, Lewis put his hand on Crystal's lower back. Crystal told him to stop; Lewis stopped "for a minute" but then resumed. Although Crystal attempted to push Lewis' hand away, Lewis tried to put his hand farther down her back, into her pants. Crystal told him, "no."[2] Feeling unsafe, Crystal stood up and tried to pull a box cutter out of her back pocket, intending to cut Lewis, but the box cutter slipped from her hand.

While Lewis and Crystal were on their feet near a cross, Lewis held Crystal's pants by the belt loop with one hand, forced his other hand inside her pants, and inserted one or more of his fingers into her vagina. Crystal felt pain and told him "no" and "stop." She tried to pull Lewis' hand out of her pants, but he just dug deeper. She kept telling him to stop, but he persisted.

Lewis kept his finger or fingers inside Crystal's vagina as he pushed or pulled her, against her will, approximately 33 feet through a gate, down a walkway, and behind the church between two windows. He then pushed her against the wall of the

[2] At this point, Crystal was on the phone with Malysa. Malysa confirmed at trial that she heard Crystal twice say to someone, in a serious voice, "[N]o, stop, don't."

church, held her by her pants, and tried to bend her over as she faced the wall. By this time, Crystal's pants and underwear had come down part way. Lewis announced that he was going to "stick it in from the back," and Crystal replied, "no." Lewis tried to insert his penis into her vagina from behind and said: "'[Y]ou know you want it. Just let me put it in.'" Crystal said "no" and told him to stop; refusing to spread her legs, she was able to prevent him from forcing his penis into her vagina.

Crystal continued to struggle with Lewis, ending up on her back on the ground. Ignoring Crystal's continued pleas to stop, Lewis pinned her down, lowered her pants and underwear, and inserted his penis into her vagina.

After Lewis stopped his assault, he walked away laughing and called her "bootsy," which is slang for "lame." Crystal texted Malysa that she had just been raped.

At home, Crystal went to the bathroom and felt a burning sensation when she urinated. She also saw blood, apparently coming from her vagina, on her underwear. Crystal burst into tears and told her mother that Lewis had raped her. Crystal's mother called police.

Crystal was transported to Highland Hospital, where a "SART" examiner found genital injuries consistent with sexual assault. Crystal's pants and underwear were collected as evidence.

The police investigation proceeded over the next two years. In October 2006, Crystal was interviewed by police. In June 2007, the SART kit was submitted for analysis. That same month, Lewis told police he did not have sex with Crystal or anyone behind a church, and he allowed the police to take a DNA sample. In August 2008, Lewis' DNA was matched to DNA collected from Crystal's underwear.

The police presented Crystal with a photographic lineup in September 2008. She pointed to Lewis' photograph, but was tentative about the identification because, she claimed, she was reluctant to relive the incident. Crystal subsequently identified Lewis at the preliminary examination and at trial.

4

## 2. 2007 Rape of Sabrina

Sabrina testified that after midnight on August 26, 2007, she was waiting for friends outside their Oakland apartment building, when she was grabbed from behind. She tried to hit her assailant with her purse and told the attacker to let her go. A male voice replied, "We could do it the easy way or the hard way." Sabrina was frightened.

The man dragged Sabrina by her hair about four blocks to a dark isolated area in a park, as she struggled and continued to ask him to let her go. He pushed her onto a picnic table, so that her head was on the table and her knees were on the bench. He unbuttoned her pants and pulled down her pants and underwear. She kept saying "no" and was afraid she was going to die. He inserted his penis into her vagina, rubbed her breast, and tore her shirt. After moving his penis back and forth inside her vagina, he released his grip on her and she ran away. The attacker warned Sabrina that if she told anybody, he would hurt her friends, whom he named.

Sabrina nonetheless reported the rape to her friends. They took her to Highland Hospital, where she underwent a sexual assault examination and her clothes were collected as evidence. An examiner found bruises to her arm and thigh and blunt trauma to her vaginal opening – injuries that he opined would not normally be caused by consensual intercourse.

The SART kit in Sabrina's case was submitted for DNA analysis in September 2007. Ultimately, the 2008 DNA analysis matching Lewis' DNA sample to Crystal's SART kit sample provided a "cold hit" in Sabrina's case: Lewis was the major sperm donor in two samples from Sabrina's underwear.

## 3. 2008 Murder of Tibbs

Tibbs, a Navy veteran and substance abuse counselor at a church, lived in a ground-floor apartment in East Oakland with his fiancée, Pamela Davis (Davis), along with their daughter and Davis' other two children. According to Davis and Davis' sister, Tibbs was "laid back" and neither threatening nor aggressive.

Davis testified about her dog, which Lewis claimed he wanted to see on the night of Tibbs' murder. She explained that, in 2007, a man named Carl Williams

5

(Williams) had kept a pit bull in the backyard of a nearby abandoned house. In early December 2007, Davis asked to have the dog after it was nearly hit by a car, and Williams agreed. The next day, Williams was killed. Davis and Tibbs kept the dog in their apartment and named it "Cinnamon." In the ensuing months until May 2008, Lewis never asked to see the dog or went to Davis' apartment to visit it. Nor did he ever claim that it was his dog.[3]

On the night of May 21, 2008, Tibbs was in the apartment studying for his college final exams, while Davis was in another state. Tibbs was just three weeks away from graduation; the day before, he had celebrated his 41st birthday. But some time after 11 p.m. on May 21, Tibbs declined to turn Cinnamon over to Lewis, and Lewis ended Tibbs' life.

Charles Berry, Tibbs' next-door neighbor, testified that he awoke to the sound of gunfire around 11:10 p.m. on May 21, 2008. Berry then heard "some glass being broken." About two minutes after hearing the first gunshots, he heard two or three more. Berry called 911 after hearing the first shots and later spoke to 911 a second time. Looking out his window, he saw a Black male walking towards the street on Tibbs' side of the fence that divided their properties.[4]

LaTonya Lee, Tibbs' upstairs neighbor, testified that she was in her bedroom and also heard gunshots shortly after 11 p.m. She called 911 (at 11:10 p.m., according to the CAD report). While she was on the 911 call, she heard glass breaking; she also heard a loud male voice that she did not recognize. When she

---

[3]     Davis' and Tibbs' neighbor, Charles Berry, confirmed at trial that Davis and Tibbs kept the dog in their apartment, he never saw Lewis with the dog, and Lewis never claimed it was his dog.

[4]     Computer aided dispatch (CAD) records indicated that Berry called 911 at 11:13 p.m.; the call was disconnected and 911 returned the call at 11:13 p.m. and 11:14 p.m. Transcripts of these calls indicated that Berry thought there had been two gunshots. At trial, Berry clarified that he heard "at least two" gunshots. Berry also provided police with a written statement, which asserted: he awoke to the sound of a gunshot around 11:15 p.m.; about 10 seconds after the first gunshot, he heard glass break; about five seconds later he heard a second gunshot; about a minute after that, he looked out the window and saw a Black male and female.

6

heard another gunshot, she called the police again. Lee peeked out her window and saw someone with "long dreads" standing on the curb and walking between her apartment building and Berry's fence. She heard a woman near the street say "'come on'" more than once.

Around this time, Davis and her sister received a call from Tibbs, saying that Lewis was outside, " shooting up the house to get the dog.'" Multiple gunshots, sounding like they were coming from outside the apartment, could be heard in the background. Davis' sister told Tibbs to call 911.

At 11:12 p.m. and 11:14 p.m., 911 dispatch logged hang-up or incomplete calls from Davis' apartment phone. At 11:16 p.m. and 11:20 p.m., Tibbs connected with 911 and reported that Lewis had shot him in the chest.

Police officers arrived at the apartment at approximately 11:20 p.m. Through a broken window, they observed Tibbs on the kitchen floor, bleeding and moaning. Officers forcibly entered the apartment through the locked front door at 11:22 p.m.

Tibbs was transported to Highland Hospital, where he died at 11:55 p.m. An autopsy found a gunshot wound to the right side of his chest.

At 11:56 p.m., Lewis and his girlfriend, Dominique Pierson, also arrived at Highland Hospital. Lewis claimed he was shot in the right hand, but his only wounds were two very "superficial" lacerations, consistent with cuts from a sharp object such as glass; the treating physician testified it was unlikely that the wounds were from a gunshot or a machete blade.

In a statement given to the police the day after the shooting, Pierson told officers that Lewis had been arguing with a man (Tibbs) about a dog. Lewis said, "'I want my fucking dog'" and "'Give me my fucking dog.'" Tibbs said, "'Get the fuck out of here,'" "'Get the fuck from in front [of] my door,'" "'This ain't your dog,'" and "'Ain't no dog here.'" When Pierson tried to persuade Lewis to leave, he told her to "[s]hut the fuck up, bitch." Near the apartment door, Lewis said, "You gonna play with me[?]' "I want my fucking dog.'" "'You, ain't gonna bring my dog outside?'" By this point, Lewis had pulled out a gun. As Pierson walked away, she heard two

7

gunshots. Lewis later ran up to her, saying, " He shot me. He shot me in my arm,'" but Lewis' hand, not his arm, was bleeding, and his hand did not look like it had been shot. Pierson and Lewis then took a bus to the hospital.[5]

Officers inspected the scene at Tibbs' apartment building. Glass from the broken kitchen window, near where Tibbs would customarily study, was both inside and outside the apartment. One bullet casing was found on Berry's driveway (on the other side of the fence from Tibbs' residence), in the general vicinity of the broken window. A second casing was found in the inside track of the broken kitchen window, consistent with a gun being fired from within the window frame.

A rusted machete that Davis kept in the kitchen was found on the ground by a walkway outside, near the broken window; small pieces of shattered glass were around the machete, but the machete had no blood on it. Strike marks consistent with the machete blade were inside the apartment above the broken window and on top of a nearby fish tank, which did have blood on it. Police did not find a gun inside the apartment, and Tibbs did not own one.

Outside the apartment, a trail of blood led to a bus stop. Forensic analysis determined that it was Lewis' blood on the glass from the broken window and on the ground outside the apartment.

The gun used to shoot Tibbs was never recovered, but police found photographs of guns on Lewis' cell phone, including a semiautomatic pistol of the same caliber as the recovered casings.

According to an investigator, Tibbs was inside the apartment, close to the window, when he was shot. Tibbs left strike marks on the inside of the window (with the machete) while Lewis was at the window.

---

[5]    At trial, Pierson was less forthcoming. She testified that she and Lewis had consumed alcohol and Ecstasy on the day of the shooting. She heard Lewis and the other man arguing about a dog, and Lewis sounded a little upset. Lewis had a gun. At some point she said, "'let's go'" and heard gunshots. She then saw that Lewis' hand was bleeding, and they went to the hospital.

### 4. October 2008 Police Interview With Lewis

On October 15, 2008, Lewis was in custody in juvenile hall for the Tibbs murder. After waiving his rights, he spoke to detectives investigating the rapes of Crystal and Sabrina. Shown a photograph of Crystal, Lewis said he had not had sex with her, or that he did not remember for sure because "[he] done has [*sic*] sex with a whole lot of girls[.]" Shown Sabrina's photograph, Lewis denied dating her, talking to her, or knowing her.

### B. Defense Case

Lewis' mother, Alicia Grayson, testified that Williams had been like an older brother to Lewis and was important in his life because Lewis' father had died before Lewis was born. Lewis helped feed and walk the dog that Williams had kept at a vacant house. When Williams was shot to death (attempting an armed robbery) in December 2007, Lewis "cried like a baby" and became depressed. She later suspected that Lewis started taking Ecstasy, noting his behavior had changed in that he "moved fast" and "talked fast."

In the afternoon of May 21, 2008, Grayson saw Lewis and Pierson on the street where Tibbs lived. Lewis was "moving fast," "speeding," and not staying still. He saw a newspaper article listing the people killed in Oakland during 2007, including Williams. Grayson left the area around dusk.

### C. Jury Verdict and Sentence

The jury acquitted Lewis of first degree murder, but found him guilty of second degree murder. The jury also found Lewis guilty of the sexual penetration and rape of Crystal and the rape of Sabrina. In addition, the jury found true the enhancement for personal use of a gun with respect to the count one murder charge, as well as the allegations of multiple victims and kidnapping as to the sexual offense counts.

Lewis was sentenced to a term of 115 years to life in state prison, comprised of: 15 years to life for the murder of Tibbs; a consecutive 25 years to life for the firearm enhancement; and a consecutive 25 years to life for each of the three sexual assault

crimes (penetration of Crystal, rape of Crystal, and rape of Sabrina), pursuant to the one strike law (§ 667.61).

This appeal followed.

II.  DISCUSSION

We address Lewis' contentions in turn.

A.  Court's Refusal to Sever Murder and Sexual Assault Charges

Lewis contends the trial court erred in denying his motion to sever the rape and sexual assault charges from the murder charge; he further urges that the joinder deprived him of a fair trial.  We disagree.

1.  Trial Court's Rulings

As mentioned, in November 2009 the court consolidated the charges against Lewis.  About two years later in 2011, the defense brought a motion in limine to sever the sexual assault charges from the murder charge, adopting the arguments in the opposition papers filed in response to the motion to consolidate.  The court denied the severance motion, based on the 2009 ruling granting consolidation.

2.  Denial of In Limine Severance Motion

Section 954 permits the joinder of "offenses of the same class of crimes[.]" Here, it is undisputed that the charges against Lewis met this standard, as the alleged rapes and the sexual assault of digital penetration are of the same class of crime as murder for purposes of the statute.  (See *People v. Maury* (2003) 30 Cal.4th 342, 395 [rape and murder are properly joinable under § 954, since both are assaultive]; *People v. Alvarez* (1996) 14 Cal.4th 155, 188 (*Alvarez*) [rape is of the same class of offense as robbery and murder for purposes of § 954].)

Where, as here, the statutory requirements for joinder are met, a trial court may still sever charges in the interest of justice and upon a showing of good cause.  (§ 954.) However, a denial of severance is within the court's discretion – and will be upheld on appeal – unless the defendant has made a sufficiently clear showing of prejudice arising from the joinder.  (*People v. Soper* (2009) 45 Cal.4th 759, 774 (*Soper*); *People v. Sullivan* (2007) 151 Cal.App.4th 524, 557 (*Sullivan*).)  Moreover, there is a strong preference for

joint trials of similar offenses committed by a defendant, due to the case-specific efficiencies and systemic economies that result. (*Soper, supra*, 45 Cal.4th at pp. 771-772; *Sullivan, supra*, 151 Cal.App.4th at p. 557.) Thus, " [w]here the consolidation meets the test of joinder,' as it does here, 'the difficulty of showing prejudice from denial of severance is so great that the courts almost invariably reject the claim of abuse of discretion.' [Citations.]" (*People v. Matson* (1974) 13 Cal.3d 35, 39.)

A motion to sever may properly be denied where the evidence underlying the charges as to one victim would be cross-admissible in the prosecution of the charges as to the other victim. (*Soper, supra*, 45 Cal.4th at pp. 774-775.) Here, Lewis contends there was no shared evidence that would be used to prove all the offenses, and respondent does not vigorously dispute the point. Cross-admissibility, however, is not necessary for the denial of severance. (*Id*. at p. 775.)

In the absence of cross-admissibility, the question becomes "'whether the benefits of joinder were sufficiently substantial to outweigh the possible "spill-over" effect of the "other-crimes" evidence on the jury in its consideration of the evidence of defendant's guilt of each set of offenses.' [Citations.]" (*Soper, supra*, 45 Cal.4th at p. 775.) Factors considered in this determination are: (1) whether some of the charges are particularly likely to inflame the jury against the defendant; (2) whether a weak case has been joined with a strong case or another weak case so that the total evidence may alter the outcome; and (3) whether one of the charges is a capital offense or the joinder converts the matter into a capital offense. Any such prejudice is then weighed against the state's interest in a joint trial. (*Ibid*.)

Lewis fails to establish prejudice. With respect to the first factor, he urges that the rapes would inflame and prejudice the jury, because they were predatory and he lied about not having sexual contact with his victims. It would be reasonable for the trial court to find, however, that the sex crimes were not unusually likely to instill in the jury any special animus against Lewis. (See *Alvarez, supra*, 14 Cal.4th at p. 189 [rape was not potentially inflammatory as to robbery and murder].) Indeed, the prosecutor's proffer showed that the circumstances of the murder were just as bad: Lewis repeatedly shot into

11

Tibbs' apartment, ending Tibbs' life merely because Tibbs would not let him see Davis' dog.  And Lewis lied about this incident as well.

As to the second factor, Lewis contends the joinder added a strong sexual assault case to a weak first degree murder case, since Lewis' DNA provided definitive proof of sexual contact and his brutality demonstrated that the contact was not consensual, while the shooting constituted mutual combat between armed men after an emotional confrontation.  However, the prosecutor's proffer of evidence seriously undermined the defense's mutual combat theory, describing Lewis' multiple conflicting stories about what occurred.  At any rate, the record does not show a difference in the merit of the cases that would suggest an improper and prejudicial joinder.  "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other.  A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper, supra*, 45 Cal.4th at p. 781; *People v. Thomas* (2012) 53 Cal.4th 771, 799.)

Moreover, to the extent Lewis demonstrated any prejudice from the joinder, he did not show that it outweighed the benefits of joinder.  Benefits inherent to joinder include seating only one jury, assigning the same counsel to prosecute and defend both cases, and processing only one appeal.  (*Soper, supra*, 45 Cal.4th at pp. 781-782.)  And in this case there were heightened efficiencies, including a single presentation of the DNA analysis and blood sample evidence.  In the final analysis, the trial court did not abuse its discretion in denying the severance motion.

3. Fair Trial

Lewis argues that even if the motion to sever was properly denied when it was made *before* trial, joinder of the rape offenses with the murder offense resulted in gross unfairness and denial of due process in light of the actual evidence *at* trial.  (See *People v. Rogers* (2006) 39 Cal.4th 826, 851.)  Specifically, he urges that the evidence of the brutal nature of the rapes likely bolstered the prosecution's ability to establish the malice element of murder.

We disagree.  There was ample evidence from which the jury could find that Lewis killed Tibbs with malice.  He went to Tibbs' home with a loaded gun, demanded that Tibbs give him Davis' dog to which Lewis had no right, and then fired repeatedly at Tibbs through a window.  As discussed *post*, there was no evidence to negate an inference of malice – such as provocation or heat of passion.  And because the jury acquitted Lewis of first degree murder (finding no premeditation or deliberation), yet convicted him of second degree murder (requiring malice), the jury demonstrated a careful sifting of the facts inconsistent with any prejudicial spillover of the evidence as a result of the joinder.  (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1013.)  In short, the joinder did not deny Lewis a fair trial, and Lewis fails to establish error.

B.  Court's Inquiry Into Possible Juror Bias

Lewis next contends the court deprived him of his right to an unbiased and impartial jury by not conducting an adequate inquiry into possible juror bias, based on juror comments about Lewis and defense counsel at trial.  We disagree.

1.  Law

The trial court has broad leeway in addressing the possibility of juror bias.  As our Supreme Court has stated:  "The decision whether to investigate the possibility of juror bias, incompetence, or misconduct – like the ultimate decision to retain or discharge a juror – rests within the sound discretion of the trial court.  [Citation.]  The court does not abuse its discretion simply because it fails to investigate any and all new information obtained about a juror during trial."  (*People v. Ray* (1996) 13 Cal.4th 313, 343.)  Thus, when a trial court is aware of possible juror misconduct, the court need only make whatever inquiry is "'reasonably necessary'" to resolve the matter.  (*People v. Prieto* (2003) 30 Cal.4th 226, 274-275.)  No evidentiary hearing is required except upon a showing of a "*strong possibility* that prejudicial misconduct *has* occurred," and generally such a hearing is unnecessary "unless there is a material conflict in the evidence presented by the parties."  (*People v. Schmeck* (2005) 37 Cal.4th 240, 295, italics added, overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637; see *People v. Barnwell* (2007) 41 Cal.4th 1038, 1051 ["When a court is

13

informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*."].)

### 2. Analysis

Lewis argues that on three occasions a juror communicated potential bias against Lewis and his defense counsel, and the court should have investigated further.

#### *a. juror's complaint that Lewis was staring*

During trial, an unidentified juror told a bailiff that Lewis was "staring." The court instructed defense counsel to tell Lewis not to "focus on anybody," and later the court received the bailiff's assurance that no juror had thereafter lodged a similar complaint.

The court did not abuse its discretion. No inquiry of any juror (or effort to discover the particular juror's identity) was necessary, since there was no indication that the juror harbored bias against Lewis, feared Lewis, or was unwilling to determine his guilt or innocence based on the evidence. (Cf. *U.S. v. Owens* (6th Cir. 2005) 426 F.3d 800, 805 [where defendant had stared at a juror, the court did not abuse its discretion in failing to question the juror, since the juror had not been exposed to any extraneous influence]; see also *People v. Elliott* (2012) 53 Cal.4th 535, 583 [no questioning of jurors was necessary after defendant's misconduct, because defendant may not profit from his own misconduct].)

Lewis' reliance on *U.S. v. Simtob* (9th Cir. 2007) 485 F.3d 1058 (*Simtob*) is misplaced. There, a juror had reported that the defendant was " eye-balling'" him or her " in a *threatening* manner.'" (*Id*. pp. 1060-1061, 1064- 1065, italics added.) Because the trial court had noted that the juror felt threatened by the defendant, the incident gave rise to a presumption of prejudice and the matter was remanded for a hearing. (*Id.* at p. 1064, italics added.) Here, by contrast, nothing in the record states that a juror felt threatened as a result of Lewis' staring. Also unlike S*imtob*, defense counsel did not suggest any action the trial court did not take.

*b. juror's not looking at defense counsel*

Later in the trial, defense counsel told the court that "every time [a certain female juror] goes past me, she turns her head and looks up to the ceiling the other way in a way that makes me feel at this point that she's feeling incredibly uncomfortable at this side of the table. I'm afraid she's going to poison the jury." Defense counsel believed she was juror number four or five and further assumed "for the sake of this argument" that she was the juror who had claimed Lewis was staring. The court replied that it was not known which juror had reported the staring. In addition, the court observed: the court had "seen jurors looking all around the courtroom;" "some people don't even want to walk past [the defense table]" because "[i]t's kind of close quarters over in there;" the juror had not "voiced any problem" or indicated to the court that she was "afraid or anything;" the juror's behavior "doesn't mean that she's going to be any problem;" the court did not believe there was "any reason to be alarmed;" and the juror was "coming up and down *like everybody else*." (Italics added.)

The court did not abuse its discretion. There was no evidence that the juror who looked away from defense counsel was the juror who complained that Lewis was staring. Based on the court's personal observations, the juror was "coming up and down like everybody else" and the court had not been notified by the juror of any problem. Indeed, it would be reasonable for an entirely unbiased juror to avoid making eye contact with defense counsel in an effort to obey the statutory admonition not to communicate with the attorneys and defendant. (§ 1122.)

*c. juror's question about counsel's reactions*

The next day, a juror sent the following note to the court: "[J]ust a question asking why the defense attorney was nodding yes or no as questions are asked to a witness and smiling when it looks like a witness answers correctly. Is this allowed[?]" Defense counsel believed juror number five wrote the note, based on counsel's comparison of the handwriting to a juror questionnaire.

The court declined to speculate about the author of the note. To address the situation, the court proposed to ask the jury if anyone had a problem with either of the

15

attorneys' facial expressions or gestures.  Defense counsel *agreed* with this approach, saying it was "perfect."  Counsel also expressed her belief that the note reflected a juror's disapproval of her behavior and that this inquiry was relevant to Lewis' right to due process.  Although the court disagreed with defense counsel's characterization of the note – observing that the note simply *asked a question* (with the court confirming that defense counsel had been nodding) – the court stated that it wanted to make sure the jury was not "taking [defense counsel's nodding] the wrong way."  The court also decided to instruct the jury that counsels' facial expressions or gestures are not evidence and to disregard them.

The court addressed the jury as agreed, stating: "Are any of you jurors having a problem with either one of the attorneys in terms of facial expressions and gestures? [¶] All right. If anyone is, I just want to make sure you understand that whatever facial expressions or gestures, that's not evidence and *you're to disregard it*. [¶] All right. And the record should reflect that *no one acknowledged having any problems*."   (Italics added.)  Defense counsel did not object.

Lewis has not established an abuse of discretion.  Defense counsel expressly agreed that the degree of inquiry implemented by the court was satisfactory, and no juror expressed any concern after the court inquired.  While a juror might well be annoyed by a trial attorney who smiles and nods along with a witness' answers, there is nothing in the record to suggest that any juror might have found against Lewis due to his attorney's expressions.  Lewis fails to establish error.

C. Prosecutor's Argument Regarding Provocation

Lewis contends the prosecutor committed misconduct in closing argument by inaccurately describing the provocation necessary to reduce murder to manslaughter under a heat of passion theory.  His contention lacks merit.

1. Law of Prosecutorial Misconduct

"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.  Conduct by a prosecutor that does not render a criminal trial

16

fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, as all of defendant's claims are, "'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

One form of prosecutorial misconduct is misstating the law in closing argument. (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21.) As mentioned, Lewis contends the prosecutor misstated the law of provocation.

### 2. Law of Provocation

A homicide will constitute manslaughter rather than murder if the killing was perpetrated in the heat of passion, which arose from legally cognizable provocation. (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) The provocation must be such that it would have caused a "person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment." (CALCRIM No. 570; see *Beltran, supra,* 56 Cal.4th at p. 957.) At issue is the defendant's state of mind, not his responsive act. (*Id*. at p. 949 [adequate provocation for voluntary manslaughter does not require a finding that an ordinary person of average disposition would kill]; *People v. Najera* (2006) 138 Cal.App.4th 212, 223 (*Najera*) [focus is on whether the provocation was sufficient to cause a reasonable person to act rashly, not how the killer responded or reasonableness of the response].) Where provocation is properly at issue, "the *People* must prove *beyond reasonable doubt* that these circumstances were *lacking* in order to establish the murder element of malice." (*People v. Rios* (2000) 23 Cal.4th 450, 462.)

### 3. The Prosecutor's Argument

In discussing Lewis' heat of passion theory in closing argument, the prosecutor began by reciting the requirements that, as a result of provocation by the victim, "the defendant acted rashly and under the influence of intense emotion that obscured his reasoning and judgment," and the provocation "would have caused a person of

17

average disposition to act rashly and without due deliberation, that is, from passion rather than judgment."

The prosecutor then suggested that adequate provocation would cause a reasonable person not just to act rashly, but specifically to kill. He argued: "So for heat of passion to apply, there must be provocation that would incite the ordinary reasonable person to kill. People argue and quarrel and have fights all the time. And just because the defendant may have been upset and was passionate about it and killed because he was frustrated, angry, or feeling disrespected does not make this manslaughter. Provocation must be something that would make the ordinarily reasonable person kill the victim. [¶] You might ask yourself when would a reasonable person kill? Well, there are only very limited and exceptional circumstances that would reduce a murder to manslaughter under heat of passion. These are times when the victim has provoked his own killing and you would say, 'I would see the ordinarily reasonable person killing that victim. Well, you feel the victim deserved to die.'" Defense counsel did not object.

The prosecutor next offered an example of a parent who kills a naked child molester who was taunting him after raping his five-year-old child. The prosecutor argued: "We understand that in the heat of passion, acting under that passion, with no time to cool down, an ordinarily reasonable person would have done the same under the circumstances. We'll treat it less seriously. We'll call it manslaughter. *The victim deserved to die*." (Italics added.)

Defense counsel objected that "'[t]he victim deserves to die' is a misstatement of the law." The court responded: "Overruled. You'll have a chance to argue your rendition of it."

The prosecutor concluded by asserting that Tibbs did not do anything that would provoke a reasonable person to kill him, and therefore the heat of passion theory did not apply. Again, defense counsel did not object.

### 4. Analysis

Lewis contends the prosecution's argument was improper in two respects: (1) provocation does not require a finding that a reasonable person *would have killed*, but

only that he or she would have acted rashly; and (2) provocation does not require a finding that the victim was *deserving of death*.

### a. *reasonable person would have killed*

Lewis did not object to the prosecutor's suggestion that heat of passion provocation would incite a reasonable person to kill, or request that the jury be admonished to disregard the prosecutor's statement. Nor does he establish that such an objection and request would have been futile. Accordingly, Lewis failed to preserve the issue for appeal. (*Najera*, *supra*, 138 Cal.App.4th at p. 224 [by failing to object, defense forfeited claim that prosecutor committed misconduct in arguing that heat of passion required that the defendant's response be reasonable].)[6]

### b. *victim deserving of death*

Lewis urges that the prosecutor committed misconduct in arguing that provocation requires a finding that the victim deserved to die. Under the circumstances, we see no reasonable likelihood that the jury construed or applied the prosecutor's remark in an objectionable manner.

The prosecutor began his discussion of provocation in accord with CALCRIM No. 570, advising that the required provocation would cause "a person of average disposition to act rashly and without due deliberation, that is, from passion rather than judgment." The prosecutor did not expressly state that the law required the jury to find that Tibbs "deserved to die" in order for the jury to find provocation – although he came close. But the implications of the prosecutor's argument were less than clear: it could be inferred that the prosecutor was simply illustrating his broader point that provocation must be

---

[6] Lewis argues that, even without an adequate objection in the trial court, we have discretion to consider issues involving a criminal defendant's substantial rights. He also urges that an objection would have been futile, given the trial court's response to his objection to the prosecutor's argument about the victim deserving to die. In addition, he contends his attorney's failure to object constituted ineffective assistance of counsel. As discussed *post* in the text, however, Lewis' challenge to the prosecutor's statement, even if not forfeited, is unavailing due to the lack of evidence to support his heat of passion theory. For the same reason, his attorney's failure to object was not prejudicial, and he is not entitled to relief under an ineffective assistance theory.

19

based on some nontrivial matter sufficient to invoke an emotion that eclipsed Lewis' rational thought, and it was this emotion that caused him to kill. Accordingly, while we do not approve of the prosecutor's argument – which at least "muddied the waters" (*Beltran, supra*, 56 Cal.4th at p. 954) – we note it had less impact than a *direct* statement that the law precluded a finding of provocation unless the victim was deserving of death.

Moreover, to the extent the prosecutor implied that adequate provocation required that the victim deserved to die, the court made it clear to the jury that the prosecutor's remark was merely the argument of an advocate – not a judicial statement of the law – when it stated that defense counsel would also be able to give her "rendition." Arguments by counsel "generally carry less weight with a jury than do instructions from the court," since an attorney's arguments are likely perceived as statements of advocates, while instructions are "viewed as definitive and binding statements of the law." (*Boyde v. California* (1990) 494 U.S. 370, 384; see *People v. Mendoza* (2007) 42 Cal.4th 686, 703.)

The court buttressed the distinction between the prosecutor's argument and the law by instructing the jury that, if it thought "the attorneys' comments on the law conflict with my instructions," the jury was required to "follow [the court's] instructions". And the court's instructions – including specific instructions on heat of passion and provocation (CALCRIM Nos. 570, 522) – did not say that the jury would have to find that Tibbs "deserved to die" for provocation or heat of passion manslaughter. Despite the prosecutor's argument, the jury did not ask for any clarification of the court's instruction.

In the totality of the circumstances, it is not reasonably likely the jury concluded from the prosecutor's argument that it would have to find that Tibbs deserved to die in order to find that Lewis killed in the heat of passion. But even if the jury was led astray in this regard, Lewis would still not be entitled to a reversal, as we explain next.

5. No Prejudice / Harmless Error

Lewis cannot establish prejudice from the prosecutor's argument about provocation (under a prosecutorial misconduct theory) – or from the failure of defense counsel to object (under an ineffective assistance theory) – because there was no

20

evidence to support a heat of passion manslaughter theory anyway. For the same reason, any error in allowing the prosecutor's argument was harmless.

The theory of heat of passion manslaughter has a subjective component (the defendant was actually provoked to passion) and an objective component (the provocation would have induced a reasonable person of average disposition and self-control to act out of strong emotion or passion rather than from judgment or rational thought). (*People v. Steele* (2002) 27 Cal.4th 1230, 1252.) In the matter before us, there was no evidence of either component.

As to the passion component, the defendant's emotion must be of an "extreme intensity" – a violent, intense, high-wrought or enthusiastic emotion that precludes the defendant from rational judgment. (*Beltran*, *supra*, 56 Cal.4th at p. 950.) Lewis' voice was apparently loud, he swore a lot, and he was insistent on getting Davis' dog, but there is no evidence of the intense emotion sufficient for heat of passion. To the contrary, Pierson said Lewis was only "[a] little upset."

As to the provocation component, there was no evidence that Tibbs said or did anything that would have induced a reasonable person to act out of passion rather than judgment. Tibbs' epithets and refusal to turn over Davis' dog do not suffice. (*Najera*, *supra*, 138 Cal.App.4th at pp. 225-226 & fn. 2 [pushing and verbally taunting defendant, like a word of reproach, gesture, or even a blow, is not sufficient provocation]; *People v. Manriquez* (2005) 37 Cal.4th 547, 586 [taunting a defendant and calling him a " mother fucker'" is insufficient for provocation].) And while Lewis urges that Tibbs may have thrown the machete at him, the evidence showed that this could only have occurred – if at all – *after Lewis had already fired* at Tibbs. Both Lee and Berry testified that they heard a gunshot (or gunshots), *then* breaking glass, and then one or more additional gunshots. Since the machete was found outside the broken kitchen window amidst broken glass, it may account for the sound of breaking glass – but this happened after Lewis had fired. Conversely, there is no evidence that Tibbs threw the machete at Lewis *before* Lewis started shooting; nor is there evidence that Lewis withdrew from the altercation before Tibbs threw the machete. A defendant who

21

starts a fight cannot claim provocation under these circumstances. (*People v. Johnston* (2003) 113 Cal.App.4th 1299, 1313 [armed defendant cannot claim provocation where he was the one who challenged the victim to fight].)

Lastly, the verdict confirms that the jury rejected Lewis' heat of passion theory for reasons unrelated to the prosecutor's statements that Lewis now challenges. Since the jury convicted Lewis of second degree murder, it necessarily rejected Lewis' theories of self-defense and imperfect self-defense. And that means the jury concluded that Lewis did not actually believe Tibbs posed an imminent deadly threat. Given this conclusion, Lewis fails to persuade us that the jury would have found that Tibbs hurled the machete at him, or embraced his heat of passion theory, if the prosecutor had not made his comment about provocation. (See *People v. Moye* (2009) 47 Cal.4th 537, 541, 557 [by rejecting an imperfect self-defense claim, the jury also rejected the factual basis for a finding of provocation necessary to support heat of passion voluntary manslaughter].)

Lewis fails to demonstrate reversible error.

D. Consecutive Terms for Sexual Assault and Rape of Crystal

Lewis contends the trial court erred because it found that Lewis' digital penetration of Crystal and his rape of Crystal were separate crimes and thereby imposed consecutive 25-years-to-life terms for those offenses. Lewis is incorrect.

1. The One Strike Law

The one strike law (§ 667.1) provides harsher sentences for sexual offenses under specified circumstances. There is no dispute that section 667.1 applies to the digital penetration and rape offenses here; the question is whether the terms for those offenses could be imposed consecutively.

Subdivision (i) of section 667.1 mandates consecutive terms for one strike offenses involving the same victim on separate occasions. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1489.) The subdivision reads: "[T]he court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes involve separate victims or *involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6*." (Italics added.)

22

Whether offenses occurred on separate occasions for purposes of the one strike law thus turns on subdivision (d) of section 667.6, which requires the court to "consider whether, between the commission of one sex crime and another, the defendant had a *reasonable opportunity to reflect* upon his . . . actions and nevertheless resumed sexually assaultive behavior." (Italics added.) The subdivision further provides: "Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his . . . opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions." (§ 667.6, subd. (d).) "Although this language does not make [a reasonable opportunity to reflect] a litmus test for determining the issue, the courts have nevertheless done so." (*People v. Solis* (2012) 206 Cal.App.4th 1210, 1220.)

2. Court's Ruling

In imposing a consecutive term for the digital sexual penetration offense in count two, the court told Lewis: "And that was a count where you dug your fingers into the vagina of the victim and you [dragged] her. You could have stopped at that point. You *could have reflected and decided not to do any more*, but I consider this a separate crime when you [dragged] her . . . back and then raped her." (Italics added.)

3. Analysis

Substantial evidence supports the court's express finding that Lewis had a reasonable opportunity to reflect – and its implied finding that the sex offenses were committed on separate occasions – for purposes of the one strike law. When Lewis was digitally penetrating Crystal, he moved her through a gate to a secluded rear area. Then, after he removed his hand from inside her pants and she turned around and was facing the church wall, he tried unsuccessfully to rape her from behind. He then struggled with her, got her on the ground farther down the walkway, obtained control over her, and lowered her clothing, ignoring her pleas to stop. Then he penetrated her with his penis. The digital penetration was therefore separated from the rape by an attempted rape, a physical struggle, a change in location, and Lewis' further disregard of

23

Crystal's pleas, over a period that afforded him a reasonable opportunity to reflect on his actions before he raped her.

Lewis argues that the evidence showed a continuous sexual attack that included both the digital penetration and the rape, and he had no reasonable opportunity for reflection. However, a reasonable opportunity for reflection does not require a break of any specific duration. (*People v. Jones* (2001) 25 Cal.4th 98, 104 [construing former § 667.6].) Nor does it require that the defendant cease all assaultive behavior. (*People v. Plaza* (1995) 41 Cal.App.4th 377, 384-385.) At any rate, our role is not to reweigh the evidence, but to determine if there was substantial evidence to support the trial court's finding. For the reasons stated, there was.[7]

E. Eighth Amendment

Lewis was sentenced to 115-years-to-life, comprised of 75-years-to-life for nonhomicide offenses (25-years-to-life for each of the digital penetration and rape offenses) and 40-years-to-life with respect to the homicide offense (15-years-to-life for second degree murder and 25-years-to-life for the gun use enhancement). He contends the sentence violates the Eighth Amendment prohibition against cruel and unusual punishment, because it effectively constitutes a sentence of life without the possibility of parole (LWOP).

1. Law

An LWOP sentence may not be imposed against a juvenile offender for nonhomicide offenses. (*People v. Caballero* (2012) 55 Cal.4th 262, 268 (*Caballero*) ["sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy

---

[7] Even if the court erred in finding that the offenses occurred on separate occasions, and consecutive sentencing was therefore not mandatory under the one strike law, the court still retained *discretion* to impose the terms consecutively. (See *People v. Valdez* (2011) 193 Cal.App.4th 1515, 1524 [where § 667.6, subd. (i) does not apply, court still has discretion to impose consecutive sentences].) In light of the court's extremely dim view of Lewis' crimes, the record demonstrates that the court would exercise its discretion to impose the sentences consecutively upon remand. Any error in the court's handling of the sentences under the one strike law is therefore harmless.

constitutes cruel and unusual punishment in violation of the Eighth Amendment"]; *Graham v. Florida* (2010) 560 U.S. 48, 82 (*Graham*) [federal Constitution categorically bans the "imposition of a life without parole sentence on a juvenile offender who did not commit homicide"].) The court in *Caballero* explained: "Although proper authorities may *later* determine that youths should remain incarcerated for their natural lives, the state may not deprive them *at sentencing* of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future." (*Caballero, supra*, 55 Cal.4th at p. 268, italics added.) In so holding, *Caballero* ruled that a cumulative sentence for distinct crimes, imposing a total term of imprisonment in excess of the offender's life expectancy, is the functional equivalent of an LWOP sentence even if each of the sentences comprising the aggregate, standing alone, included the possibility of parole within his lifetime. (*Id*. at pp. 267-268.)

As to homicide offenses, the United States Supreme Court has held that a state may not impose a *mandatory* LWOP sentence on a juvenile offender, although the sentencing court might impose such a sentence if it has adequately considered the offender's age and environment and found "'irreparable corruption.'" (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2468-2469] (*Miller*) [noting LWOP sentence for a juvenile offender would be "uncommon" and imposed against the "'rare juvenile offender whose crime reflects irreparable corruption.'"]; see *Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.)

2. Analysis

Lewis contends the 75-year-to-life sentence for nonhomicide offenses is unconstitutional under *Caballero*. He also contends his 115-years-to-life aggregate sentence is unconstitutional, because 115-years-to-life is the functional equivalent of an LWOP sentence, the sentence was mandatory under the sentencing scheme (once the court decided that the one strike law offenses occurred on separate occasions), and the sentencing court did not consider Lewis' youth, background, and other circumstances as *Miller* requires. Respondent urges that, even if Lewis received the functional equivalent

25

of an LWOP sentence, the court did consider Lewis' youth and background, concluding that those factors actually pointed towards greater punishment.[8]

### a. Lewis' sentence is a de facto LWOP

Lewis' 115-years-to-life aggregate sentence, and even the 75-years-to-life component for his nonhomicide offenses, constitutes an effective LWOP. Given his presentence credits of 982 days, and assuming in-prison work credits at 15 percent (§§ 2933.1, subd. (a); 667.5, subd. (c)), Lewis would not be eligible for parole on his 75-years-to-life sentence for roughly 63 years, when he would be approximately 84 years old. Lewis contends his life expectancy is just 64.5 years, based on a table from the Centers for Disease Control and Prevention; respondent counters that Lewis' remaining life expectancy at the time of sentencing was 57.82 years, according to a different table, which would give him a total life expectancy of 78 years. Under either calculation, Lewis would not be eligible for parole within his natural life expectancy, so his aggregate sentence for nonhomicide offenses constitutes the functional equivalent of an LWOP sentence. (See *Caballero, supra*, 55 Cal.4th at pp. 268-269 [110 years to life for three attempted murders, plus enhancements, placed parole eligibility outside his normal life expectancy]; see *People v. Mendez* (2010) 188 Cal.App.4th 47, 63 [where life expectancy of 18-year-old defendant was 76 years, and eligibility for parole was at age 88 (after taking into account presentence credits and in-prison credits), sentence was

---

[8]    Before sentencing Lewis, the court told him: "None of these people had done anything to you. You're just a mean, cold person. I don't know how you got that way. You said you were deeply affected by the murder of your brother and your cousin, but instead of trying to do something better, you cause more viciousness and more heartache to this community and to these people. [¶] You deserve the same amount of consideration that you gave those three human beings -- none." This finding did not, however, comply with *Miller*: (1) *Miller* was decided after Lewis was sentenced, so the trial court could not have had *Miller* in mind; (2) when the court discussed Lewis' background, it was not in the context of whether Lewis could be sentenced to LWOP; and (3) although the court was aware of Lewis' youth, the court did not substantially discuss it when meting out his sentence. (See *Miller, supra,* 132 S.Ct. at pp. 2468-2469; *Caballero, supra*, 55 Cal.App.4th at p. 268, fn. 4.)

"'materially indistinguishable'" from LWOP ].)  And since 75-years-to-life would be an effective LWOP for Lewis, so would his aggregate 115-years-to-life sentence.

### b. application of Caballero and Miller

The question becomes what analysis should be applied where, as here, the court has consecutively imposed both a de facto LWOP sentence for nonhomicide offenses, *and* a sentence for a homicide offense and related enhancement.  The categorical ban of LWOPs and de facto LWOPs in *Graham* and *Caballero* applied to sentences that were for nonhomicide offenses only.  The possibility of imposing an LWOP upon an offender of "irreparable corruption," as discussed in *Miller*, applied to an actual LWOP sentence for a homicide offense only.  Does the fact that Lewis committed a homicide in addition to his nonhomicide offenses mean that the court might impose a de facto LWOP upon the type of finding embraced by *Miller*, even though it was Lewis' nonhomicide offenses for which he received the de facto LWOP?  Or does the absolute ban on de facto LWOP sentences under *Caballero* apply in California even though Lewis also committed a homicide?

One approach to this mixed-sentence situation – which the People supported at oral argument on the ground that *Caballero* did not address a homicide offense and *Miller* addressed only a homicide offense – is to apply *Caballero* and *Miller* to their corresponding parts of the sentence:  that is, analyze the portion of the sentence attributable to nonhomicide offenses under *Caballero*, and analyze the portion of the sentence attributable to the homicide offense under *Miller*.  Under this approach, we would find Lewis' sentence unconstitutional under *Caballero*, because it imposed an effective LWOP for nonhomicide offenses.  We would not need to reach the constitutionality of the portion of the sentence imposed with respect to the homicide; but if we did, we would find this aspect of the sentence constitutionally permissible anyway, because 40 years to life is not an effective LWOP.  Accordingly, we would vacate the

sentence and remand for the court to set a probation eligibility date within Lewis' natural lifetime, as described in *Caballero*. (*Caballero, supra*, 55 Cal.4th at pp. 268-269.)[9]

A second approach, which Lewis supported to some extent at oral argument, is to apply *Caballero* and *Miller* to the sentence *as a whole*. Because there was a homicide, the court could first determine whether the juvenile's offenses reflected irreparable corruption: if they did, the court would impose the de facto LWOP (since *Miller* would allow an actual LWOP for such a defendant who committed a homicide, certainly it would allow a de facto LWOP for such a defendant who committed a homicide and additional crimes); if Lewis' offenses did not reflect irreparable corruption, the court would have to set a probation eligibility date within the juvenile's expected natural lifetime. Under this approach, since the sentencing court in this case did not find or even consider whether Lewis' offenses reflected irreparable corruption, we would remand for the *Miller* determination and, if no *Miller* finding is made, the court would establish a parole eligibility date within Lewis' natural life expectancy.

A third approach would be to apply only the *Caballero* per se ban to the sentence as a whole, even though one of Lewis' crimes was a homicide, and reject the possibility of an LWOP sentence under *Miller*. In support of this approach, California might choose to employ a rule that is more favorable for the defendant than the United States Supreme Court requires; and as a matter of policy, it might be argued, even a juvenile who has committed a homicide should be able to have a parole eligibility hearing at some point in his or her lifetime, since the difficult task of evaluating a juvenile's corruption would be unnecessary at sentencing if it could be accomplished later by a parole board.

Of interest in this regard is the recent decision in *People v. Ramirez* (2013) 219 Cal.App.4th 655 (*Ramirez*). There, two juveniles were convicted of first degree murder and second degree murder, with enhancements and special circumstances. The shooter

---

[9]     Arguably, Lewis' parole eligibility date would not be earlier than the parole eligibility date he would receive on his 40-years-to-life sentence, since that sentence as to his homicide-related offense is not an effective LWOP and is not constitutionally infirm. We need not address that question, since the sentencing court has not set a parole eligibility date.

received LWOP plus 65 years, and the nonshooter received 90 years to life. Thus, each juvenile offender had an LWOP or a de facto LWOP based purely on homicide-related offenses. The trial court did not make a *Miller* determination that the juveniles' crimes reflected irreparable corruption. (*Ramirez*, *supra*, 219 Cal.App.4th at p. 685.)

The appellate court in *Ramirez* reversed the sentences, holding that sentencing the juveniles to an actual or effective LWOP, without taking into consideration their youth and related factors, constituted cruel and unusual punishment under *Miller*. (*Ramirez, supra*, 219 Cal.App.4th at pp. 683-685.) The court further concluded that the juveniles could not be sentenced to an actual or effective LWOP upon remand. (*Id*. at p. 685.) The court observed that in California the ultimate decision to keep a juvenile offender in prison for life can be decided later (at a parole eligibility hearing), so "a sentencing decision which forecloses a juvenile offender's options at the outset would appear inconsistent with both the spirit and rationale of *Graham* and *Miller*." (*Id*. at p. 686.) Furthermore, the Legislature's enactment of section 1170, subdivision (d)(2) – which guarantees a juvenile the opportunity to seek recall of an actual LWOP after serving 15 years for most offenses – suggests the Legislature would not approve of imposing a theoretically lesser sentence on a juvenile without any possibility of parole. (*Id*. at pp. 686-687.) The court also noted that, although there is a distinction between a homicide (in *Ramirez*) and a nonhomicide (in *Caballero*), that distinction did not bear on the offenders' relative culpability, because in both *Caballero* and *Ramirez* the offender *intended* to kill someone. In the majority's view in *Ramirez*, *Caballero* implied that a gang member's intent to kill rival gang members, without more, was insufficient to meet the *Miller* construct of irreparable corruption. (*Ramirez*, *supra*, 219 Cal.App.4th at p. 688.)

The court in *Ramirez* therefore directed the trial court to "exercise its discretion to impose sentences which ensure these juvenile defendants have a meaningful opportunity to demonstrate rehabilitation and potentially obtain their release within a reasonable period of time." (*Ramirez, supra*, 219 Cal.App.4th at p. 688.) In short, the court did not

29

remand for consideration of the *Miller* "irreparable corruption" finding, but to set a parole eligibility date as in *Caballero*.[10]

### c. conclusion

In our view, the constitutionality of a parole eligibility date must be determined by looking at the sentence as a whole, since a defendant obtains a single parole eligibility date based on the entirety of his or her sentence. In this case, Lewis was convicted not just of nonhomicide offenses, but of a homicide offense as well. Our Supreme Court was careful to point out that *Caballero* did not address a situation where the juvenile offender, like Lewis, had committed a homicide. (*Caballero, supra*, 55 Cal.4th at p. 268, fn. 4.) Since the United States Supreme Court recognizes there are circumstances in which a juvenile who commits a single homicide as his only offense might be found to be of such irreparable corruption as to warrant an actual LWOP without offending the Eighth Amendment, certainly there could be circumstances in which a juvenile who commits a homicide *and* three separate one strike sexual offenses could be of such irreparable corruption as to warrant a de facto LWOP without offending the Eighth Amendment. Because the trial court in this case did not have the opportunity to make this determination under *Miller*, we will remand for the trial court to have that opportunity. (*Miller, supra,* 132 S.Ct. at pp. 2468-2469; *Ramirez, supra*, 219 Cal.App.4th at pp. 689-690 (Aronson, J., concurring & dissenting). See *Caballero, supra*, 55 Cal.App.4th at p. 268, fn. 4 [under *Miller*, the sentencing court must " 'take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison"].) If the court does not find that Lewis' offenses reflect irreparable corruption within the meaning of *Miller*, the court shall set a parole eligibility date within

---

[10]    In a concurring and dissenting opinion, Justice Aronson concluded that the parties should be given an opportunity to address the defendants' corrigibility on remand, in light of the absence of evidence on that issue in the record. Justice Aronson noted that *Caballero* expressly did not consider whether an LWOP or its functional equivalent could be imposed on a juvenile who commits murder, *Miller* declined to foreclose the possibility, and the trial court's sentencing choice on remand might moot any constitutional question. (*Ramirez, supra,* 219 Cal.App.4th at pp. 689-691 (Aronson, J., concurring & dissenting).)

Lewis' expected lifetime as set forth in *Caballero*. (*Caballero, supra*, 55 Cal.4th at pp. 268-269 ["the sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board"].)

### III. <u>DISPOSITION</u>

The matter is remanded for the trial court to determine a parole eligibility date within Lewis' expected lifetime, unless it finds that Lewis' offenses reflect his irreparable corruption within the meaning of *Miller v. Alabama* (2012) 132 S.Ct. 2455. In all other respects, the judgment is affirmed.

_____

Needham, J.

We concur:

_____

Jones, P.J.


_____

Simons, J.

31

Superior Court of the County of Alameda, No. C163699, Joan S. Cartwright, Judge.

Shannon Chase, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Senior Assistant Attorney General, Seth K. Schalit and Laurence K. Sullivan, Supervising Deputy Attorneys General for Plaintiff and Respondent.

A134480